WARREN *v.* CONNOLLY.

ATTORNEY AND CLIENT—COURTS — CONTEMPT — INVESTIGATION OF MISCONDUCT OF JURY.

    Where an attorney published in a newspaper of which he was proprietor, an article intimating that in a certain criminal case, some person or officer tampered with the jury, and that one of the jurors accepted a package resembling money, from the officer in charge, the court was not authorized to issue an *ex parte* order requiring the publisher to file a written affidavit in open court, setting up the facts on which the article was based; and an offer on his part to disclose in private to the court what information he had and the sources of it was all that could be properly required.

Mandamus by Francis H. Warren against William F. Connolly, judge of the recorder's court for the city of Detroit, to require the court to vacate an order entered without a hearing or notice. Submitted February 14, 1911. ( Calendar No. 24,433.)   Writ granted March 31, 1911.

*Warren & Marshall,* for relator.

*Stewart Hanley, amicus curiæ,* for respondent.

MOORE, J. On December 6, 1910, one Wesley B. Schram was tried in the recorder's court of the city of Detroit before the Honorable William F. Connolly, judge of the recorder's court, upon the charge of unlawfully discriminating against one Emma Davis, for the reason that she was a colored person. The case was in the recorder's court on appeal from the police court. The trial resulted in a verdict of not guilty, and the defendant, Schram, was accordingly discharged.

On the 10th day of December, 1910, an article appeared in a newspaper called the Detroit Informer, reading as follows:

## '' Was the Jury Fixed ?

### "Prosecutor Aldrich Made a Very Strong Case for the People in the Majestic Theatre Case.

"Despite the fact that defense made weak case the jury, after being out several hours, said defendant Schram was 'not guilty.'

### "Charge of Judge Connolly a Correct Statement of the Law.

"The Emma Davis-Majestic Theatre case, otherwise known as the case of the *People* v. *Wesley B. Schram*, was tried in Judge Connolly's court, Tuesday, Dec. 6. Judge Aldrich appeared for the people and made an exceptionally strong cose.     Misses Davis and Gertrude Thompson were the people's witnesses and told a clear, straight-forward story of their exclusion from the theatre, expressly because 'this place is not for colored people' and 'if you don't go out we will throw you out.'

### '' Defense Looked Like ' Frame Up.'

'' Mr. Frank D. Eamans was the defendant's counsel and he made a rather novel, but apparently weak defense. Setting up as facts that the two young ladies were politely told that the seats they occupied belonged to a lady and child who had gone to the retiring room and that because of this gentle treatment they left the theatre in a huff. But the very witness sworn for the defense admitted that the 'lady and child ' were given other seats, that seats were being vacated all the time and others filling them. This witness got badly tangled in his testimony and others were nearly as bad, exemplifying the old saying about certain persons needing ' a long memory.' Mr. Eamans made a strong plea to the jury, but his position was shot all to pieces by the powerful logic of Judge Aldrich.

### '' Was the Jury Fixed ?

'' And it seemed to many that the defendant would surely be convicted by the jury under the correct statement of the law of the case by Judge Connolly. But a suspicious incident took place just as the jury was entering the jury room.   One of the jurors tarried in the court room fumbling with his coat and hat and had a conversation with the officer in charge of the jury.   When the case first started this same officer was seen to receive a

small package resembling money. Of course there may have been no connection between the two acts of this officer receiving the small package and his conversation later with the juror, who apparently hung back for that purpose. Nor yet between either or both of these incidents and the verdict of the jury and The Informer does not claim there is.

"Mrs. Davis, mother of Miss Emma, and others were told of these incidents at the time and to look out for a verdict of not guilty or a disagreement if the jury were out very long. In view of the verdict as thus predicted the incidents referred to have at least a suspicious look.

'Defendant Fined by Judge Jeffries.

"This is the same case in which the defendant was fined $50 by Judge Jeffries when the case was tried in his court and defendant was found guilty. He appealed the case to Judge Connolly's court and here the jury discharged him as shown above."

An editorial appeared in the same issue as follows:

"The incidents related in another column of this issue that cast a suspicion that there was a connection between the acts of court officers and verdicts of the jury should never occur in courts of justice. The officials having in charge the jury to determine the right or wrong of a case should be like Cæsar's wife: above suspicion. There should be no clandestine passing of suspicious looking packages, no conversation with any of the jurors as they are passing into their room to judge the acts of defendants. They should stand out in the open all the time and never do or say anything that could possibly lead one to believe that they were other than strictly honest in their official conduct."

Upon the same day and without notice to the relator the following order was entered:

"In the Recorder's Court of the City of Detroit.
        "*In re* Francis H. Warren.
"Connolly, J.
"The Session of December 10, 1910.
"*The Court:* It appearing to the court that a paper called the Detroit Informer, which purports to be edited by Francis H. Warren, who is a member of this bar, contains an article which the court feels reflects upon the

conduct of the officers in charge of the jury in the case of the *People* v. *Wesley B. Schram*, by innuendo, and there appearing in the same edition an editorial in corroboration of the article, the court enters an order directing the said Francis H. Warren to file upon oath a statement of facts justifying the publication of this article, on or before Thursday, December 15th, at 9:30 a. m.

"Mr. Clerk, you will notify Mr. Warren of the order of the court."

Mr. Warren appeared before the court and stated he was appearing, not as an attorney, but as publisher and editor, and that he was willing to give the court all the information he had under oath, if desired, but not in open court. The court declined to receive this information, and a motion was made to vacate the order of the court for the following, among other reasons:

"(1) The article complained of by the honorable court contains all the information necessary to aid the court in making such investigation it may see fit to make. There was but one officer that had charge of the jury in the case of the *People* v. *Wesley B. Schram* at the time it retired, and the court well knows who that officer is, and if he is the honest man he is said to be, he will tell the court all about the incidents referred to in the Detroit Informer, and should have told of them before now. Then there was but one juror who hung back in the courtroom after the others had entered the jury room. If his conversation with officer was innocent, he should step to the front and relieve his fellow jurors of suspicion. There was but one person who handed the officer the package 'resembling money.' This man is well and favorably known, but if his act was innocent of wrong doubtless he can give the court a satisfactory explanation of the incident, for he knows Francis H. Warren saw it.

"(2) For the reason that the demand made in the order of December 10, 1910, calls for matter in a public way that is more properly the subject of private examination, resembling matters that should be examined by grand juries. * * *

"(5) There is no legal duty devolves upon publisher to comply with the court's order until matter is brought up in regular manner."

The notice to vacate was overruled and the case is brought here by mandamus.

The attitude of the relator and the respondent is indicated by the following extract from the record. Mr. Warren is addressing the court:

" It may be that the incidents referred to were innocent, and if they are, certainly I ought not, as publisher of the Detroit Informer, to be made to expose these gentlemen in a criminal matter by making a criminal charge under oath. Your honor can sit as a grand jury; the same matter may be disposed of by the grand jury method, by the court taking the place of the grand jury. The court says it does not approve of star chamber sessions; but the ordinary grand jury sessions are star chamber sessions. Nothing is supposed to leak out from the grand jury, and nothing should leak out from an investigation of this kind, unless the court is satisfied that a crime has been committed. Let me point out that the Detroit Informer did not claim that a crime has been committed, but there was only a suspicion that there might have been a crime committed, and that gave rise to the question that the court objected to or does object to.

" *The Court:* You are entirely mistaken in your position of the attitude of the court—

"*Mr. Warren:* Apparently you did object, or you would not have called me in to make a sworn statement about what I stated in the Informer.

" *The Court:* The natural inference was that some officer of the court, and jurors of the court, who were and are officers of the court, had so comported themselves as to render them open to the suspicion of fixing somebody, or being fixed. You are an officer of this court. As an attorney—

" *Mr. Warren:* I am not appearing in this matter as an officer of the court. I am appearing as publisher and editor of the Detroit Informer.

" *The Court:* You cannot be a dual personality with reference to this. If you have any facts upon which to base a statement that this jury was fixed, and that any man on this jury was fixed, or that any officer did any act which would lay him open to the suspicion that he had tampered with the jury, the court is entitled to know it, and it is your duty to give it.

" *Mr. Warren:* Not in open court.

"*The Court:* Why not ?

"*Mr. Warren:* Because it may be that the acts could be explained without exposing them to the open.

"*The Court:* You have done worse than that. In the way you publish the story no one knows who is the responsible one; and, among other things, one of the honored officers of this court has been retired since this thing happened; and we want to know, if anybody is under suspicion, who he is.

"*Mr. Warren:* You are perfectly welcome to the information, but not to file it in a public way. The law says—the Supreme Court says that written complaints are unnecessary.

"*The Court:* That may be; but I don't want to do anything as judge of this court which is not public. I do not propose to have any man accused, unless in public. If any man is under suspicion, or is to be accused, I want him in public where he can hear it and defend himself against it. I won't allow anybody to be accused in any other way.

"*Mr. Warren:* In the very case that the court cited last Monday, the case of George W. Parker, the court does not say that it must be in the open; it does not direct that the investigation must be in the open, the preliminary investigation.

"*The Court:* The judge who wrote the opinion says that the practice indulged in in the Ascher Case was bad. That's what he does say.  *  *  *

"Here is a case where an individual's constitutional right is involved, the equal right of a man to be treated the same as every other man, notwithstanding his color; and you print an article in your paper to the effect that the jury was fixed—not saying that the jury was fixed, as a bald statement, but by the use of that figurative form that is well recognized in rhetoric, asking the question, 'Was the jury fixed ?' which is tantamount to the expression—

"*Mr. Warren:* It is one thing to entertain a suspicion and another thing to make a charge.

"*The Court:* A suspicion may be more damning than a charge.

"*Mr. Warren:* There is no law resting upon me to convey this information to the court.

"*The Court:* I think there is.

"*Mr. Warren:* I wish the court would point it out.

"*The Court:* There is the oath which you took as an officer of this court when you were admitted to the bar.

\*        \*        \*        \*        \*        \*

"*The Court:* You occupy a peculiar position different from the ordinary individual, with reference to the court. You are an officer of the court, and, as such, where anything affects the integrity of the court's proceeding or the administration of justice, your duty, it seems to me, is plain.

"*Mr. Warren:* I have made no claim where it did affect it.

"*The Court:* I think you have.

"*Mr. Warren:* If the court takes that view of it, we will have to try it out on that ground. But I claim I have made no such claim. I said these acts, specifically, may be innocent, but they gave rise to a suspicion; and not only in the article itself, but in the editorial, I say so.

"*The Court:* What the court wants to know—the court will determine whether or not the acts are suspicious, or criminal—but the court wants to know what the acts are.

"*Mr. Warren:* The court is entitled to know; but not in public. That is the position we take in this matter, just the same as a grand jury is entitled to know.

"*The Court:* I think any proceedings of a court ought to be public. I do not propose to be led by anybody into the policy of holding secret investigations of anybody. Any time a man comes into my court he is going to be where he can hear it, and if he isn't around he is not going to be accused.

"*Mr. Warren:* There is no objection to his presence, and his hearing these things; hearing them right there with me and you.

"*The Court:* If you have any facts and the court tells you it is your duty to indicate them, I can't see why you should hesitate.

"*Mr. Warren:* \* \* \* I do not think the court has the right to censor publications, unless they are absolutely criminal.

"*The Court:* I am not trying to censor your publications.

"*Mr. Warren:* That would be the effect of your order.

"*The Court:* Oh, no. I am trying to get from you all the facts.

"*Mr. Warren:* If the suspicion proved groundless,

then every one of these men could sue the Informer for libel.

"*The Court:* I think not."

The attorney who appears for the respondent says in his brief:

"It would be well, we believe, at the outset of this discussion, that it be understood that the order entered by Judge Connolly was not for the purpose of censoring relator's publication, nor to punish relator as the publisher of the articles in question. The proceeding was solely for the purpose of requiring Mr. Warren, an officer of the court, to disclose those facts within his knowledge upon which were based the articles casting suspicion upon the jury in the Schram Case and the officers in charge thereof. Mr. Warren indicated his willingness to give these facts to the judge in private, but objected to filing such a statement in open court, as requested by the judge."

It appears to us that if that was the only purpose of the court, the relator indicated a willingness to do all he should be required to do to realize that purpose. Counsel say:

"The court had authority to direct the manner in which Mr. Warren make his statement. Upon this point the only question involved is whether the court had authority to order Mr. Warren to file the required statement under oath in open court. By asking permission to file such a statement, but only for the private perusal of the judge, Mr. Warren practically concedes that the court had authority to demand the statement, but only questions the authority of the court to direct this to be done in open court."

And in support of this proposition the language used in *People* v. *Parker*, 145 Mich. 488 (108 N. W. 999), is cited. A reference to the case will show that what was said does not refer to something which occurred out of court and after the trial was over, but related to an investigation during the progress of the trial, in which investigation the parties to the litigation were deeply interested. This was also true of the inquiry in the case of *People* v. *Ascher*, 130 Mich. 540 (90 N. W. 418, 57 L. R. A.

806). The language quoted in the brief by the attorney for the respondent shows it was not necessary to the disposition of the case, and the justice writing the language was careful to say, "Speaking for myself, I desire to say I do not regard that as the proper practice." We find nothing in those cases to indicate that the course suggested by the relator was not a proper one.

We again quote from brief of counsel for respondent:

" No court is bound to await the complaint of a third party before investigating any matter touching the misconduct of its officers, when information considered sufficient is received, and the circumstances in its judgment demand its interposition. The court alone is to judge of the grounds upon which a rule may issue." *Randall* v. *Brigham*, 7 Wall. (U. S.) 523; *In re Wool*, 36 Mich. 299. * * *

" We submit that this matter is controlled by *Randall* v. *Brigham*, and *In re Wool, supra.*"

A reference to the two cases will show that they were both disbarment proceedings. In the last of these cases the disbarment proceedings grew out of what appeared in a chancery case, heard and decided by the court in which the disbarment proceedings were pending. In disposing of the case the court used the following language:

"The charges made against Wool in the bill of complaint, which formed the only basis of action in that case, were such as, if true, were enough to render him deserving of punishment. If no such suit had been brought, and a complaint had been laid before us against him, a full hearing on evidence taken in some adequate way would have been necessary. But no method of examination adopted in summary proceedings could have been so full or suitable as that furnished by the issues and hearing in an equity cause, where the witnesses are examined and cross-examined in such manner as the parties desire, and there is time for an exhaustive scrutiny. After such a hearing there is no very good reason why any further showing on the main facts should be had, unless under circumstances which would justify a rehearing. Accordingly, where the court has itself heard the cause and passed upon the facts, as is done in equity, an order to

show cause is properly based on the decree, and might have been incorporated in the decree itself."

In the case of *Randall* v. *Brigham, supra,* the court said, among other things :

" The informality of the notice, or of the complaint by the letter, did not touch the question of jurisdiction. The plaintiff understood from them the nature of the charge against him; and it is not pretended that the investigation which followed was not conducted with entire fairness. He was afforded ample opportunity to explain the transaction and vindicate his conduct. He introduced testimony upon the matter, and was sworn himself.

" It is not necessary that proceedings against attorneys for malpractice, or any unprofessional conduct, should be founded upon formal allegations against them. Such proceedings are often instituted upon information developed in the progress of a cause, or from what the court learns of the conduct of the attorney from its own observation. Sometimes they are moved by third parties upon affidavit; and sometimes they are taken by the court upon its own motion. All that is requisite to their validity is that, when not taken for matters occurring in open court, in the presence of the judges, notice should be given to the attorney of the charges made and opportunity afforded him for explanation and defense. The manner in which the proceedings shall be conducted, so that it be without oppression or unfairness, is a matter of judicial regulation."

So far as these cases are in point they are against the contention of respondent. In the case at bar we have an *ex parte* order entered, not in the alternative, but requiring the relator to justify in writing under oath, and in open court, an act which occurred out of court. Our attention has not been called to any authority justifying such an order.

The writ of mandamus will issue as prayed, but without costs to either party.

HOOKER, McALVAY, BROOKE, and BLAIR, JJ., concurred.